DAWKINS, J.
Plaintiff appeals from a judgment rejecting her demands in an action upon an insurance policy for the sum of $5,000 upon the life of her deceased husband, Lucky P. Chapman.
Defendant admitted that deceased at the time of his death was in physical possession of the policy, as alleged, and that plaintiff was named as the beneficiary therein, but denied that the said policy had ever been lawfully issued or delivered to the deceased, or that any liability on its part had ever arisen thereunder, on the following grounds, to wit:
First, that the policy had not been delivered while the deceased was in good health, as required by the application for the insurance; and
Second, that the premium had not been paid during such period of good health as was also required by the application made part of the policy.
Statement of the Case.
September 20, 1915, Lucky P. Chapman applied to the defendant company for a policy of life insurance, known as a “20-pay life,” carrying an annual premium of $188.-95, and at which time he was 34 years of age. He was examined hy the local physician of defendant company, the application was in due course received and accepted, and the policy forwarded to its local soliciting agent, S. I. Jeeter, at Shreveport, and received by him about October 1st; About the same day Jeeter had occasion to go to Minden, La. (where deceased seems to have had some kind of business requiring a good portion of his time, although his home was in Shreveport), took the policy with him, met Chapman on the street the same day, and handed the policy to him. The deceased looked it over, handed it back to Jeeter, and informed the latter that it was “O. K.,” and *661 said, “I will be borne Sunday, and we will fix it up Sunday.”
On October 14th deceased called on Dr. R. E. Smith at his office in Minden, and informed the latter that he was suffering with a pain in his right side. After watching him for several days, Dr. Smith diagnosed his case as appendicitis, and advised deceased to return to his home in Shreveport and submit to an operation. Chapman returned to Shreveport, but did not have the operation performed, and came back to Minden on October 25th, on which date Smith was again called in. The diagnosis was again appendicitis, and Chapman was also advised to have the operation. Deceased again returned to his home in Shreveport, about the 26th of October, after wiring his family physician, Dr. A. S. Reisor, who met him at the train. Dr. Reisor pronounced the trouble stones in the kidneys; in fact, says that one passed through the ureter to the bladder, and that this was what caused the pain or suffering. He also found albumin in the urine. Chapman was apparently free of pain on the 27th, but Dr. Reisor continued his visits every day until the 29th, which was the last during that attack, and at which time deceased was up and walking about his house. This doctor was again called in on November 3d, and thereafter saw Chapman on November 4th, 5th, 13th, 23d, and 24th, at his home, and on December 9th he visited Dr. Reisor’s office. The next and last visit was on December 11th, the day the patient died, according to this witness, of uremic poison. Reisor’s diagnosis was nephritis, or inflammation of the kidney, and says that on the occasion of the visit, November 3d, deceased had an attack of uremic coma. His opinion was that Chapman’s trouble was serious, though not ordinarily or necessarily fatal, and that the stones might have passed and Chapman recovered if he had taken proper care of himself.
At the time of taking the application from Chapman on September 20th, Jeeter had agreed that he would remit the company its premium, less his own commission, and that he would accept individually deceased’s notes maturing 60 and 90 days from the date of the application.
On October 25th, Jeeter addressed a letter to Chapman at Minden, La., advising that he had been to deceased’s house for the purpose of closing the matter; that he had found deceased away; that he had reported settlement to the company, and if Chapman desired he would either deliver the policy to Mrs. Chapman, or mail it to Min-den, and the two notes which were already prepared could be signed when deceased returned. Jeeter next called on Chapman about the 26th or 27th at his home, and found him sitting up in his pajamas. Deceased informed Jeeter that he had been sick, and demurred a little to receiving the policy under those circumstances, but Jeeter insisted that the matter had been closed and placed beyond recall by his remittance to the company, so Chapman signed the notes and the agent handed him the policy. For some reason unaccounted for in the record the defendant did not receive the check which Jeeter mailed on October 25th, and he sent a duplicate on November 22d, which was cashed and credited to the policy. The policy, as issued, bore the same date as the application, that is, September 20, 1915, and the future premiums were to have been paid on that basis.
When the proofs of death were sent in, they disclosed that Chapman had died, according to the attending physician, of uremic poison, resulting from stones in the kidneys, and that the first attack had occurred about October 25th. The defendant took the position that in these circumstances the policy had not been delivered and the first premium paid while the insured was in good *663 health, and declined to remit the amount of the policy. This suit followed, and the company made a tender of the amount of the first note, which had been paid, and of the second note which did not mature until March, 1916, the latter having been obtained from Jeeter, who held it individually.
Opinion.
The clause in the application upon which the defendant relies, as having prevented the policy from ever becoming effective, reads as follows:
“This application is made to the Mutual Life Ins. Co. of New York. All the following statements and answers and all those I make to the company’s medical examiner in continuation of this application are true, and are offered to the company as an inducement to issue the proposed policy. I expressly waive on behalf of myself, and of any person who shall have or claim any interest in any policy issued hereunder, all provisions of law forbidding any physician or other person who has attended or examined me, or who may hereafter attend or examine me, from disclosing any knowledge or information which he thereby acquired. The proposed policy shall not take effect unless and until the first premium shall have been paid during my continuance in good health, and unless also the policy shall have been delivered to and received by me during my continuance in good health; except in case conditional receipt shall have been issued as hereinafter provided.”
As we see the case, there are three questions presented: The first, one of fact, as to whether deceased was, in legal contemplation, still in good health at the time the policy was left in his possession, and which may or may not be important, depending upon the determination of the second, a legal issue; second, as to whether as a matter of law the policy was delivered while Chapman was in good health; and, third, if there was no lawful delivery until October 26 or 27, and deceased, at that time, was not in good health, did or not the company have such notice thereof in law as to preclude a denial of liability on the policy after delivering it and accepting the premium?
[1] As to the question of fact, taking into consideration the circumstances detailed in the preceding statement of the case, we are constrained to hold that the deceased was not in that reasonable “good health” contemplated by the use of that expression in the application on October 26th or 27th, when the policy was finally left in his possession. Whether his ailment was appendicitis, as diagnosed by the first physician, called on October 14th, or stones in the kidneys, as claimed by the second, who saw him first on October 26th, we think that the trouble was serious, and that he never fully recovered up to date of his death. In either case, if the cause for his subsequent illness existed at the time of the examination by the local physician, after making the application, neither he nor the physician knew it, and, having met the company’s requirements as an acceptable risk, we think his ill health must be treated as dating from October 14, 1915.
[2] Taking up the second point as to when delivery as a matter of law took place, we must note that the arrangement for the settlement of the premium was agreed upon between deceased and defendant’s local agent prior to taking the application, in that the agent was to remit to the company therefor, less his ’ commissions, according to an understanding with it by which he was given 60 days within which to report the business, regardless of when the policy took effect. In these circumstances, we think the premium was settled at the taking of the application, and the subsequent signing of the notes was the mere putting into writing the contract which had already been lawfully made (the notes really bore date September 20, 1915), and at least as to this the condition in the application with reference to its payment while in good health was *665 fully met, since. we have found that the ill health dated from October 14th.
Delivery of the Policy.
[3] In view of the foregoing, shall we say that there was no delivery until the policy was actually left in the hands of the deceased and the notes signed? In the first place, the execution of the notes, under the system which the agent was allowed to employ, became a matter of no concern to the company. As a matter of fact, before agreeing to handle personally Chapman’s notes, Jeeter had made inquiry as to the former’s financial responsibility, and had found it such as to justify him in carrying the indebtedness for the premium, and later actually remitted to the company before getting the notes signed. Therefore, when the application for the insurance was received and accepted, the policy issued and mailed to Jeeter, defendant looted to and would undoubtedly have held him (Jeeter) for the payment of the premium, and he, in turn, was the one who would have had the right to enforce the private agreement between himself and Chapman. Hence delivery as between the insurer and the insured took place when the policy was placed in the mails, addressed to the local agent. Joyce on Ins. vol. 1, p. 428, § 62; Yonge v. Equitable Life Assur. Society (C. C.) 30 Fed. 902; Mutual Life Ins. Co. v. Reid, 21 Colo. App. 143, 121 Pac. 132; 63 L. R. A. 840; 23 L. R. A. (N. S.) 969; 52 L. R. A. (N. S.) 276. This was prior to October 1, 1915, and therefore more than two weeks prior to the first illness. Then, again, the policy was actually tendered to the deceased about October 1st, was found all right by him, and he handed it back to Jeeter, with the statement that he would return home on the following Sunday and put into writing that part of the agreement for the premium which contemplated the giving of negotiable notes to Jeeter. In this situation, it would seem clear, in the absence of any private agreement with the agent, the company could have enforced the payment of the premium. Why? Because the legal relation which bound them together had fully attached. If its rights, therefore, had become fully enforceable, did not the corresponding rights in favor of the assured begin from that date?
Notice.
It is earnestly contended by counsel for defendant, and authority cited to support the proposition, that inasmuch as the policy and application stipulate that no one but a general officer of the company can qualify or waive any of their stipulations or conditions, if we were to find that the policy was not delivered until October 26th or 27th, when, to the knowledge of the local agent, the deceased was not in good health, that agent could not waive the stipulations which made it effective only if delivered in good health. However, the conclusions which we have announced as to the other issues preclude the necessity for passing upon this question.
For the reasons assigned, it is ordered, adjudged, and decreed that the judgment appealed from be annulled and reversed, and that the plaintiff do have and recover of the defendant judgment in the full sum of $5,000, with legal interest from judicial demand until paid, and all costs.