311 So.2d 454 (1975)
NEW JERSEY LIFE INSURANCE CO.
v.
HENRI PETETIN, INC. and H. H. Hansell, Inc.
No. 55247.
Supreme Court of Louisiana.
February 24, 1975.
Rehearing Denied March 31, 1975.
*455 Val A. Schaff, III, Schaff & Currier, New Orleans, for defendant-applicant.
Harry McCall, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for plaintiff-respondent.
BARHAM, Justice.
Although this litigation was instituted to question the validity of five life insurance policies, it has resolved itself in this Court to a determination of the validity of only one life insurance policy, Policy No. 109526. That policy, issued by New Jersey Life Insurance Company (hereinafter referred to as New Jersey Life), on the policy date of April 10, 1969, insured Lawrence A. Comiskey in the amount of $100,000.00, and named Petetin, Inc., as the beneficiary. Both the lower court and the appellate court declared the policy without effect on the basis that there had been no actual delivery of the policy to the insured before his death on April 29, 1969.
In late 1968, Morris Shapiro, a New Orleans insurance broker and a general agent for New Jersey Life and other insurance companies, began to reappraise and rearrange life insurance policies for Lawrence A. Comiskey. The policies Comiskey had with other companies carried the rated premium schedule for sub-standard risks because he had a mild case of diabetes mellitus. Shapiro undertook to replace these policies with policies at a lower premium rate. On December 12, 1968, an application, Part 1, signed by Comiskey, was submitted to New Jersey Life's home office in Newark, New Jersey. A physical examination was had and the medical examination report and application, Part 2 were subsequently forwarded to New Jersey Life. After a pre-insurance investigation by New Jersey Life and the receipt in their Chicago underwriting office of an EKG, chest X-ray and urine specimen, New Jersey Life issued two graded whole life policies on Comiskey, dated January 28, 1969, in the amount of $25,000.00 each. Other life insurance policies were applied for during January, February, March, and April of 1969.
Shapiro's written memoranda in connection with these negotiations for life insurance, except as hereinafter noted, were always addressed to:
Eddie Barts
DepartmentNew Jersey Life
SubjectLawrence Comiskey
From DepartmentMorris Shapiro
Barts was a partner in Reinsurance Service Bureau and was the superimposed general agent for New Jersey Life and Globe Life Insurance Company. It is difficult to ascertain from the record exactly where his office was located, but the underwriter for New Jersey Life testified that Barts solicited business from brokers and agents out of the New Jersey Life underwriting office in Chicago. A Mr. Binder was New Jersey Life's only underwriter in the Chicago office from December 1968 until April 1, 1969 when he was joined by Mr. King, who had been the underwriter for Globe Insurance Company, which maintained offices on the same floor a few feet *456 from New Jersey Life's underwriting office.
Almost all, if not all, of the written correspondence between Shapiro and Barts ended up in the New Jersey Life files in policies applied for or issued by New Jersey Life in spite of the fact that some of the correspondence appeared on stationery supplied by other life insurance companies. Shapiro testified that in all transactions with him, Eddie Barts constituted the New Jersey Life Insurance Company. It is without doubt that to the extent it can be verified in writing, all of Shapiro's communication is directed to Barts and New Jersey Life as though they were the same party.
According to Mr. Kenneth J. Kaufhold, Manager of the Policy Service Department of New Jersey Life's home office, his company had contracted with Eddie Barts in his capacity as representative for Reinsurance Service Bureau, which customarily contracted with agents throughout the United States who wrote sub-standard insurance. To service their sub-standard business, New Jersey Life subsequently established an underwriting office for sub-standard insurance in the Chicago office. New Jersey Life had placed the underwriting office in Chicago in order to finalize the contract with Reinsurance Service Bureau. The close relationship between Barts (Reinsurance Service Bureau), the Chicago underwriter, and the New Jersey Life home office can readily be seen by the fact that Reinsurance Service Bureau was permitted to send TWX communications to the home office over the signature of the underwriter. Reinsurance Service Bureau would supply the applications and the other necessary data to the underwriter in Chicago, who would determine whether to issue policies on the basis of the applications, medical work-ups and other information. If the underwriter decided that the policy should be issued, he sent all of the material pertaining to the applicant to the home office in Newark, with instructions to issue the policy. According to Mr. Kaufhold the underwriters kept no records other than copies of their file; the entire file would be sent to the New Jersey Life home office. Kaufhold also testified that although the Reinsurance Service Bureau and Barts placed sub-standard insurance risks with other companies, Barts was a special contract agent of New Jersey Life during the time of negotiations for the policy under consideration here.
A total perusal of the record renders indisputable the fact that Barts received frequent telephonic and written communications from Shapiro between December, 1968 and April, 1969. The first communication resulted in the aforementioned two graded whole life policies of $25,000.00 each on Comiskey's life which the underwriter Binder determined to issue. Thus Binder sent a quote-sheet and the entire file, including applications, Parts 1 and 2 and all other medical information to the New Jersey Life home office in Newark, ordering the two $25,000.00 graded whole life insurance policies. On the basis of the quote-sheet prepared by Binder, the special risk division of New Jersey Life's home office issued the two policies which were delivered to Comiskey via Shapiro.
The background of the method used in the issuance of these two policies is essential to arrive at an understanding of the problem which arose under the policy before us for consideration. Shapiro found that he could sell still more insurance to Comiskey, so he attempted to obtain several other policies in the course of a continuing exchange of communication with Barts and New Jersey Life after January. To complete an order for the issuance of a policy, an underwriter is required to supply the home office with a "quote-sheet," which also is mailed to the local agent, and a "work-sheet," which shows some of the background information and work of the underwriter. King testified (and the physical exhibit confirms his testimony) that, as a New Jersey Life underwriter, on *457 April 9, 1969, he sent to Shapiro a quote-sheet which stated "Final Quotation of: Table Std * * * Maximum Amount $100,000 * * * The policy is being issued and held for H.O.S."[1] The quote-sheet did not indicate to Shapiro or to New Jersey Life that any application form was required or missing. Both the work-sheet and the quote-sheet sent to the home office on that policy called for $100,000.0 whole life. The previously written-in requirement of "H.O.S." had been scratched out and the work-sheet had been amended to read, "App. to be supplied on delivery." Neither Shapiro nor Comiskey received a copy of the work-sheet. It was prepared only for home office use.
That work-sheet listed four life insurance policies with New Jersey Life in the amount of $25,000.00 each. All four were policies that had been handled between December, 1968, and April 1, 1969. Therefore, it is clear that Barts, Reinsurance Service Bureau, the underwriting office of New Jersey Life in Chicago, and the home office of New Jersey Life in Newark, had a continuing file on Lawrence Comiskey from December, 1968, through April 10, 1969, when the underwriter in Chicago ordered the $100,000.00 whole life insurance policy. The home office had the originals of numerous Part 1 and Part 2 applications. It had EKG's, chest X-rays and urine specimens, including a urine specimen which had been sent specifically for analysis in connection with the $100,000.00 policy, No. 109526. King is adamant that he ordered $100,000.00 whole life. Both the quote-sheet and the work-sheet show the words "graded," or "gr." to have been inserted in writing other than King's to modify the request for "WL" (whole life).
From the testimony of all the New Jersey Life officers it is certain that someone in the issuing office in Newark determined that King had made an error in requesting $100,000.00 whole life for Comiskey and this person attempted to correct it by qualifying it as graded. All witnesses believe that the error of issuing "graded" whole life was a purely clerical error that occurred during issuance because a clerk, who noted that all four previous policies issued on Comiskey had been graded, concluded on his own that this policy should be graded as well. Comiskey, Shapiro, Barts, and King all knew on April 9, 1969, that they had a contract for the issuance of a $100,000.00 whole life policy at a quoted premium of $70.00 per $1,000.00, or $7,000.00 annually.
On April 10, 1969, Policy No. 109526 was issued with a policy date of April 10, 1969 and with a face amount of $100,000.00 insurance. That policy was received by agent Shapiro in New Orleans. He discovered that instead of a level $7,000.00 annual premium with accrued cash values based on the higher premium pay-in, an annual graded whole life policy levelling off after five years, with smaller premiums and smaller cash values increasing to a high level after five years, had been substituted. On April 25, 1969, Shapiro sent the following speed letter message, along with transmittal of Policy No. 109526, to Barts:
 "SPEED LETTER
 "TO EDDIE BARTS FROM MORRIS SHAPIRO
 CHICAGO NEW ORLEANS
"SUBJECT L. A. COMISKEY POLICY NO. 109526
 MESSAGE
 DATE April 25, 1969
"Enclosed find policy number 109526 on the life of L. A. Comiskey, 100,000 graded whole life. You goofedi We requested 100,000 whole life quoted at $70 per thousand with an annual premium of 7,000. Basic rate was $67.50 plus $2.50 per thousand additional total quoted $70 per thousand. We are returning graded whole life for premium in excess of 4,000. Please rush. This case has been sold about four times. Waiting issuance of the policy. Again my thanks.
 "Sincerely,
 (signed) Morris"
This was received in the Chicago office on April 28, 1969, and on that same date *458 the following telegram was sent to the home office:
"NJ LIFE CHIC TOPENI FROM JIM KING
RE: LAWRENCE COMISKY [sic]
PLEASE REISSUE POLICY 109526 FOR LAWRENCE COMISKY FOR $100,000 W.L. AS INDICATED ON WORKSHEET. 5G.W.L. POLICY FOR $100,000 TO BE RETURNED.
"IMMEDIATE HANDLING WILL BE GREATLY APPRECIATED."
Also, on April 28, 1969, Shapiro, by speed letter, sent to New Jersey Life in Chicago the following message attached to a check for $300.00, which was made payable to New Jersey Life Insurance Company:
 "SPEED LETTER
 "TO: New Jersey Life FROM: Morris Shapiro
 Chicago, Ill. New Orleans, La.
 "SUBJECT: Lawrence A. Comiskey $100,000.
 MESSAGE Date: 4/28 1969
"Enclosed find check in amount $300. as deposit on above case. Globe check dated 3/27/69 returnedpolicies returned for exchange in New Jersey. This is annual case and will be paid for upon deliverydeposit taken waiting for cash value surrender of other policyRush policy.
 "SIGNED: Morris Shapiro"
That money was duly forwarded to the home office in Newark. On March 1, 1969, Shapiro had received $1,000.00 in cash and a note for the balance of $6,000.00 in payment of a $7,000.00 premium on $100,000.00 whole life insurance for Comiskey. On April 9, 1969, that $7,000.00 premium payment was automatically attributed to New Jersey Life's Policy No. 109526 when King notified Shapiro that the policy was being issued.
The salient conclusions which can be drawn from this long statement of facts are: while Shapiro was an agent for other insurance companies as well as New Jersey Life, and Barts had a reinsuring contract with companies other than New Jersey Life, at a date no later than April 9, 1969, both Shapiro and Barts were general agents for New Jersey Life for the purpose of securing the policy of $100,000.00 for Mr. Comiskey. In Louisiana, a life insurance agent is statutorily prohibited from acting as agent for the insured when he solicits insurance from a company for whom he is agent and by whom he is paid.[2] Thus, when Shapiro and Barts were notified by New Jersey Life that the policy was being issued, at that moment at least, they were agents for New Jersey Life. On April 9, 1969, King, who as underwriter had authority to order the issuance of the policy, notified Shapiro of the final quotation for $100,000.00 whole life subject to only one condition, "hold for H.O.S." (Emphasis here and elsewhere supplied). The urine specimen had already been received before. April 10, 1969, when New Jersey Life was forwarded the work-sheet. As far as Comiskey was concerned, New Jersey Life's agent had collected the required premium. Premiums paid to an agent constitute payment to the insurer under the law. New Jersey Life knew that it was to issue $100,000.00 whole life at a $7,000.00 level premium. It had a contract to deliver such a policy, for the premium had been paid, and all conditions had been agreed upon. It issued that policy, which was a binding contract. See La.C.C. arts. 1797 and 1803.[3] *459 Thus, the policy was definitely issued but due to a simple clerical error in New Jersey's Life's issuing office, which is attributable solely to New Jersey Life, the policy contracted for was issued quoting the wrong premium and providing an erroneous table for cash value. There was and there is a policy No. 109526 which contains an erroneous computation of premiums and the wrong table for cash values. However, all other terms and conditions of the policy are correct and appear as agreed upon.
Because the policy was returned to the company for reformation to bring it into compliance with the contract for insurance, it is argued that there is no policy of insurance No. 109526. To further buttress this argument it is contended that there could be no policy at all for two reasons: (1) there was no delivery; and (2) application, Part 1 had to be signed before the policy could become effective.
We can quickly dispose of the first argument because we have concluded that the policy was delivered when it was issued and mailed in New Jersey. Coci v. New York Life Insurance Company, 155 La. 1060, 99 So. 871 (1924). We have consistently adhered to the rule stated in the Coci case which followed Chapman v. Mutual Life Ins. Co. of New York, 146 La. 658, 83 So. 887 (1920). In those cases the application for the policy stipulated for delivery of the policy when the insured was in good health. The cases specifically held that actual or physical delivery is not necessary to effectuate the contract of insurance if the contract is otherwise completed. See also 1 Couch on Insurance 2d, § 10:5 (1959). Policies of insurance take effect from the date of issuance unless the contract provides for some other express specified date or time. Parties may agree to an ante-date, to a post-date, or to a date conditional. 1 Couch on Insurance 2d, § 8:2 (1959). It is also provided in Couch:
"If the contract has been completed in good faith so that the risk has commenced, it is not material that loss or death occurs thereafter and prior to manual delivery of the policy, * * *." Id. at § 10:7.
Although respondents argue that Coci and Chapman are inapposite to this case, we find that those cases make broader statements of law on delivery than are required in the case we consider. No corrections or amendments were made to the application or to the policy after the company's acceptance on April 9, 1969. The policy provides, if no premium is paid no insurance becomes effective until the policy is delivered to insured while in good health and while the information contained in the application remains unchanged. Under Coci and Chapman, the mailing date is the date of delivery. On that date the insured was in good health and there were no material changes in the content of the application.
The fact that the agent returned the policy for reformation does not vitiate its delivery. New Jersey Life acknowledged the need for reforming the policy in order to eliminate clerical errors and to comply with the contract between the parties. We simply reform the policy as originally issued and delivered to conform to the intent of the parties and their contract. The contract of insurance is not synonymous with the policy of insurance. La.C.C. *460 art. 1762.[4] The variance here was due solely to a simple clerical error which is not an error that gives rise to rescission. See La.C.C. arts. 1819 through 1846.
But even without resort to the Coci and Chapman rule, this case must still be decided in favor of the insured because here the premium had been paid by the insured and accepted by New Jersey Life through its agent, Shapiro, on April 9, 1969, before the policy was issued. Thus, the contract was completed in good faith by the insured and the policy was effective on the date of the issuance, April 10, 1969.
The second argument is that a required precedent to an effective policy of insurance was the signing of application, Part 1, in spite of the fact that application, Part 2 had been signed by Comiskey. However, the practice of New Jersey Life in issuing life insurance policies to this particular individual indicates that application, Part 1 was an insignificant instrument in connection with this policy. New Jersey Life had a file full of applications signed by this applicant. They were even so gracious as to supply from that file the information contained on the application, Part 1 which they attached to the policy we consider. It contained no erroneous information except for that supplied through the carelessness in their issuing office. For example, while knowledgeable of four other insurance policies with New Jersey Life, they indicated the insured had insurance policies with other companies only. The same mistake that is included in the policy is repeated in application, Part 1 by showing the plan of insurance to be "graded." Otherwise, the information given on application, Part 1 was correct. The signing of the application was not a motive or a cause for this particular contract. Without regard to signature, all other information (other than clerical errors) contained in the application is not at variance with New Jersey Life's knowledge or the actual conditions which existed when they issued the policy. Moreover, the signature of Comiskey on Part 2 of the application is affixed immediately after the following provision:
"The above answers are true and complete to the best of my knowledge and belief, and are a continuation of and form a part of the application for insurance on my life to NEW JERSEY LIFE INSURANCE COMPANY."
Under the facts of this case, and strictly adhering to the facts of this case, we can find no requirement for a signature on this application, Part 1 before it can be made a part of the policy or as a consideration for its issuance; rather, just as with all the other provisions of the insurance policy, it became part of the contract of insurance without signature.
The principle which brings us to our conclusion that New Jersey Life cannot raise these errors in the confection, execution and delivery of the policy as vice sufficient to rescind Policy No. 109526 is found in La.C.C. arts. 1901 and 1903:
"Art. 1901. Agreements legally entered into have the effect of laws on those who have formed them [Agreements formed according to law bind those who make them].
"They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law.
"They must be performed with good faith."
"Art. 1903. The obligation of contracts extends not only to what is expressly stipulated, but also to everything that, by law, equity or custom, is considered *461 as incidental to the particular contract, or necessary to carry it into effect."
The real meaning of these two articles as applicable here is that once a party to a contract has given his consent and there is negligence attributable only to that party in the confection of the instrument which evidences the contract, he cannot require the courts to vitiate the contract for that would be an exercise of bad faith by the obligor. The contract was completed, the policy was delivered and paid for; the errors it contained were clerical only and they were attributable solely to the party complaining. That party cannot take advantage of such errors to the detriment of the other consensual party who wishes to enforce the contract. To do so is to exercise bad faith, which is not permitted in the formation of contracts. Moreover, as the contract was already complete and all conditions agreed upon, New Jersey Life could not subsequently impose a unilateral requirement, concerning which there had been no notice or agreement, that the application be signed by the applicant.
We also look to La.C.C. arts. 1945 (Second and Fourth), 1949, 1950, 1956, 1957 and 1958.[5]
Respondents make an alternative argument in brief upon our finding that there was actually a policy of insurance. In that event, they contend that the policy should be voided, alleging that Comiskey gave an incorrect answer to a question in Part 2 of his application for insurance. The court of appeal addressed itself to this question when it ruled that Policies Nos. 108711 and 108712 were effective policies of insurance. We accept that court's reasoning and conclusion as applied to the same facts under the policy we consider. See 297 So.2d at 729 and 730.
For the reasons assigned, the judgment of the court of appeal is reversed insofar as it declares Policy No. 109526 void. We declare Policy No. 109526 to be a valid contract of whole life insurance, at a level premium of $7,000.00 annually, for a face value of $100,000.00. Costs in this Court are assessed against plaintiff.
SUMMERS, J., concurs.
NOTES
[1] This is "Home Office Specimen" which means hold for urine specimen, according to the testimony.
[2] La.R.S. 22:180 provides:

"No life insurer shall provide in any application, policy or certificate of insurance that the person soliciting such insurance or any person who is engaged in the business of soliciting insurance for the insurer and whose compensation is either paid by the insurer or is contingent upon the issuance of such policy, is the agent of the person insured. No such insurer shall insert in any policy or contract any provision to make the acts or representations of such person binding upon the insured."
[3] La.C.C. art. 1797 provides:

"When the parties have the legal capacity to form a contract, the next requisite to its validity is their consent. This being a mere operation of the mind, can have no effect, unless it be evinced in some manner that shall cause it to be understood by the other parties to the contract. To prevent error in this essential point, the law establishes, by certain rules adapted to the nature of the contract, what circumstances shall be evidence of such consent, and how those circumstances shall be proved; these come within the purview of the law of evidence."
La.C.C. art. 1803 reads as follows:
"But when one party proposes, and the other assents, then the obligation is complete, and by virtue of the right each has impliedly given to the other, either of them may call for the aid of the law to enforce it."
[4] La.C.C. art. 1762 provides:

"The contract must not be confounded with the instrument in writing by which it is witnessed. The contract may subsist, although the written act may, for some defect, be declared void; and the written act may be good and authentic, although the contract it witnesses be illegal. The contract itself is only void for some cause or defect determined by law."
[5] "Art. 1945. Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:

"* * *
"SecondThat courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
"* * *
"FourthThat it is the common intent of the partiesthat is, the intention of all that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.
"Art. 1949. When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question.
"Art. 1950. When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms.
"Art. 1956. When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.
"Art. 1957. In a doubtful case the agreement is interpreted against him who has contracted the obligation.
"Art. 1958. But if the doubt or obscurity arise for the want of necessary explanation which one of the parties ought to have given, or from any other negligence or fault of his, the construction most favorable to the other party shall be adopted, whether he be obligor or obligee."